JUDITH A. DESCALSO  (CBN 103211)
Law Office of Judith A. Descalso
960 Canterbury Pl., Ste. 340
Escondido, CA 92025
Ph:  (760) 745-8380 phone
Email: jad@jdescalso.com


Attorneys for Debtor


UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| In Re: | Case No. 20-01448-MM11 |
| | RS #1 |
| CLEVELAND STREET BEACH LOFTS, LLC, | DECLARATION OF JAMES SIMCOE IN SUPPORT OF DEBTOR'S PLAN OF REORGANIZATION |
| Debtor. | |
| | Date: 7/20/20 |
| | Time: 9:00 A.M. |
| | Dept: 1 |
| | Judge: Hon. Margaret M. Mann |

I, James Simcoe, declare:

1.      I am over the age of 18 years.  I am the manager of the Debtor, Cleveland Street Beach Lofts, LLC (CSBL).  I am familiar with and have personal knowledge of the operations of the Debtor.  Except as otherwise noted, I have personal knowledge of the facts contained in this Declaration and, if called as a witness could and would testify competently as to the matters stated herein.

2.  In addition to the information provided in my earlier declaration filed herein [Doc #66-2] and incorporated in this Declaration, I reviewed the attached

letter from SeaBreeze Vacation Rentals to support my conclusion as set forth in the Supplemental Information [Doc #88] that short term rentals will produce more revenue for the Debtor than long-term rentals.  A copy of the letter from Seabreeze Vacation Rentals is attached hereto as Exhibit "A".

3.  Since the filing of the Plan and the Supplemental Information I am in receipt of another letter of intent from a proposed DIP lender, Legalist, Inc. that offers the Debtor up to $3,000,000.00 in DIP financing.  We have not finalized negotiation of terms with Legalist, but I provide this letter in support of the Plan and Supplemental Information filed herein. A copy of the letter from Legalist is attached hereto as Exhibit "B".

I declare under penalty of perjury that the foregoing is true and correct.


Dated: 7/15/20                             */s/ James Simcoe*
                                          James Simcoe

EXHIBIT "A"



June 30, 2020

Jim Simcoe
314 N Cleveland St.
Oceanside, CA 92054

Hi Jim,

Thank you for the opportunity to submit this vacation rental proposal for the new ground up construction 10 units located at 314 N Cleveland St., Oceanside. After touring the property, I believe it would be an incredible vacation rental, earn the highest cash flow return, and help align with your financial goals.

Oceanside is one of the premier vacation destinations in the United States with a large and increasing demand for coastal vacation rentals. Clientele consists of high-income individuals and families from across the US and internationally. The proximity to the beach, pier, harbor, downtown Oceanside, Legoland, niche design, new construction, and (future) noteworthy décor, allows for increased demand, and niche marketability.

Thank you for your time and consideration, I look forward to working together. I plan on exceeding my projections and your expectations. If you have any questions please don't hesitate to contact me.

Warmest Regards,

Rory R. Revier
rory@seabreezecorp.com
(760) 519-0377

![Seabreeze Vacation Rentals logo]

1

## I.        Introduction:

We, SeaBreeze Vacation Rentals, are excited that you're considering hiring us as your vacation rental management company. Our company was founded in 2002, and started with just one home (the Owner's). Slowly the business began to grow as the neighbors continued to enlist our help to represent their properties. Over 16 years later, our experience and innovation have made us one of the largest vacation rental management companies in the industry.

Our success has been predicated on building a trusting relationship with each property Owner while providing an exceptional Guest experience. We do this by treating each home as if it was our own. Whether it's a luxury home, or a beach cottage, we have a variety of properties from San Diego to Los Angeles, international, and everything in between. SeaBreeze is proud to bring top quality service, management, passion, and dedication, to the vacation rental industry. We look forward to the opportunity of serving you!

## II.       Financial Analysis:

Overall there is a high cash flow return on the subject 10 unit building, 314 Cleveland St. Financial analysis is conservative and includes the new amenities (ground up construction, new interior/exterior, and furnishings). Attached are 4 specific unit vacation rental projections.

Total 10-unit rental income calculation below:
- o   Total projected annual income of $874k
- o   Net to Owner of $656k, less management fee of 25% only
- o   Annual occupancy rate of 65%

Unit income calculations below:
- o   Units #1-#4, 2 bedrooms, 2.5/1.5 bathrooms, West facing, & projected income of $85k.
- o   Units #5-#7, 2 bedrooms, 2/1 bathrooms, East facing & projected income of $72k.
- o   Units #8-#9, 3 bedrooms, 2.5 bathrooms, East facing, & projected income of $106k.
- o   Units #10, 3 bedrooms, 2.5 bathrooms, Penthouse, West facing, & projected income of $106k.

| PROPERTY OWNER | Jim Simcoe & Taj Waggaman |
|---|---|
| PROPERTY ADDRESS | 314 Cleveland St. (2 Beds, West Decks, Units #1-4) Oceanside, 92054 |
| VRBO # | |
| EMAIL ADDRESS | |

### RENTAL OCCUPANCY ESTIMATE

| MONTH | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Total/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| RATE PER ROOM PER DAY | $125 | $125 | $148 | $148 | $113 | $198 | $263 | $248 | $138 | $163 | $198 | $213 | $181 |
| DAYS BOOKED/EST | 16 | 18 | 20 | 18 | 16 | 22 | 28 | 24 | 16 | 18 | 20 | 20 | 236 |
| DAYS AVAILABLE | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| RATE PER DAY | $250 | $250 | $295 | $295 | $225 | $395 | $525 | $495 | $275 | $325 | $395 | $425 | $361 |
| WEEKLY RATE | $1,500 | $1,500 | $1,770 | $1,770 | $1,350 | $2,370 | $3,150 | $2,970 | $1,650 | $1,950 | $2,370 | $2,550 | $2,075 |
| MONTHLY/ANNUAL TOTAL | $4,000 | $4,500 | $5,900 | $5,310 | $3,600 | $8,690 | $14,700 | $11,880 | $4,400 | $5,850 | $7,900 | $8,500 | $85,230 |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Total/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESTACT OCCUPANCY % | 52% | 64% | 65% | 60% | 52% | 73% | 90% | 77% | 53% | 58% | 67% | 65% | 65% |
| Est Bookings Per Mo High | 2.1 | 2.6 | 2.6 | 2.4 | 2.1 | 2.9 | 3.6 | 3.1 | 2.1 | 2.3 | 2.7 | 2.6 | 31.0 |
| COMMISSION RATE | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| MONTHLY/ANNUAL COMM | $1,000.00 | $1,125 | $1,475 | $1,328 | $900 | $2,173 | $3,675 | $2,970 | $1,100 | $1,463 | $1,975 | $2,125.00 | $21,308 |
| OWNER'S MONTHLY NET | $3,000 | $3,375 | $4,425 | $3,983 | $2,700 | $6,518 | $11,025 | $8,910 | $3,300 | $4,388 | $5,925 | $6,375 | $63,923 |

**OWNER'S MONTHLY NET**



Roy Rover
Seabreeze Vacation Rentals, Regional Director North County
(760) 519-6377
roty@seabreezecorp.com
sedbreezevacationrentals.com



**SEABREEZE** — *Vacation Rentals*

| PROPERTY OWNER: | Jim Simcoe & Taj Waggaman |
| PROPERTY ADDRESS: | 314 Cleveland St (East Docks Units #5-7) |
| | Oceanside, 92054 |
| VRBO #: | |
| EMAIL ADDRESS: | |

## RENTAL OCCUPANCY ESTIMATE

| MONTH | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| RATE PER ROOM PER DAY | $123 | $123 | $138 | $138 | $108 | $168 | $208 | $198 | $108 | $138 | $148 | $175 | $153 |
| DAYS BOOKED/EST | 16 | 16 | 20 | 20 | 16 | 22 | 28 | 24 | 16 | 18 | 20 | 20 | 236 |
| DAYS AVAILABLE | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| RATE PER DAY | $245 | $245 | $275 | $275 | $215 | $335 | $415 | $395 | $215 | $275 | $295 | $350 | $305 |
| WEEKLY RATE | $1,470 | $1,470 | $1,650 | $1,650 | $1,290 | $2,010 | $2,490 | $2,370 | $1,290 | $1,650 | $1,770 | $2,100 | $1,768 |
| MONTHLY/ANNUAL TOTAL | $3,920 | $3,920 | $5,500 | $5,500 | $3,440 | $7,370 | $11,620 | $9,480 | $3,440 | $4,950 | $5,900 | $7,000 | $72,040 |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESTACT OCCUPANCY % | 52% | 57% | 65% | 67% | 52% | 73% | 90% | 77% | 53% | 58% | 67% | 65% | 65% |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Est Bookings Per Mo High | 2.1 | 2.3 | 2.6 | 2.7 | 2.1 | 2.9 | 3.6 | 3.1 | 2.1 | 2.3 | 2.7 | 2.6 | 31.0 |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMMISSION RATE | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| MONTHLY/ANNUAL COMM | $980.00 | $980 | $1,375 | $1,375 | $860 | $1,843 | $2,905 | $2,370 | $860 | $1,238 | $1,475 | $1,750.00 | $18,010 |
| OWNER'S MONTHLY NET | $2,940 | $2,940 | $4,125 | $4,125 | $2,580 | $5,528 | $8,715 | $7,110 | $2,580 | $3,713 | $4,425 | $5,250 | $54,030 |

OWNER'S MONTHLY NET




Jory Ravier
eabreeze Vacation Rentals: Regional Director North County
760) 519-0377
ory@seabreezecorp.com
eabreezevacationrentals.com

**SEABREEZE** — *Vacation Rentals*

| PROPERTY OWNER: | Jim Simcoe & Taj Waggaman |
| PROPERTY ADDRESS: | 314 Cleveland St. (3 Beds, East Units #8-9) |
| | Oceanside, 92054 |
| VRBO # | |
| EMAIL ADDRESS | |

**SEABREEZE** — *Vacation Rentals* —

## RENTAL OCCUPANCY ESTIMATE

| MONTH | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| RATE PER ROOM PER DAY | $108 | $108 | $125 | $125 | $102 | $165 | $208 | $198 | $105 | $132 | $150 | $175 | $148 |
| DAYS BOOKED/EST | 16 | 18 | 18 | 20 | 16 | 24 | 28 | 26 | 16 | 18 | 18 | 20 | 238 |
| DAYS AVAILABLE | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| RATE PER DAY | $325 | $325 | $375 | $375 | $305 | $465 | $625 | $595 | $315 | $395 | $450 | $525 | $444 |
| WEEKLY RATE | $1,950 | $1,950 | $2,250 | $2,250 | $1,830 | $2,970 | $3,750 | $3,570 | $1,890 | $2,370 | $2,700 | $3,150 | $2,553 |
| MONTHLY/ANNUAL TOTAL | $5,200 | $5,850 | $6,750 | $7,500 | $4,880 | $11,880 | $17,500 | $15,470 | $5,040 | $7,110 | $8,100 | $10,500 | $105,780 |

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EST/ACT OCCUPANCY % | 52% | 64% | 58% | 67% | 52% | 80% | 90% | 84% | 53% | 58% | 60% | 65% | 65% |
| Est Bookings Per Mo High | 2.1 | 2.6 | 2.3 | 2.7 | 2.1 | 3.2 | 3.6 | 3.4 | 2.1 | 2.3 | 2.4 | 2.6 | 31.3 |
| COMMISSION RATE | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| MONTHLY/ANNUAL COMM | $1,300.00 | $1,463 | $1,688 | $1,875 | $1,220 | $2,970 | $4,375 | $3,868 | $1,260 | $1,778 | $2,025 | $2,625.00 | $26,445 |
| OWNER'S MONTHLY NET | $3,900 | $4,388 | $5,063 | $5,625 | $3,660 | $8,910 | $13,125 | $11,603 | $3,780 | $5,333 | $6,075 | $7,875 | $79,335 |



OWNER'S MONTHLY NET

Rory Revoir
Seabreeze Vacation Rentals, Regional Director North County
(760) 519-6377
rory@seabreezecorp.com
seabreezevacationrentals.com

**SEABREEZE** — *Vacation Rentals* —

5

PROPERTY OWNER: Jim Simcoe & Taj Waggaman
PROPERTY ADDRESS: 314 Cleveland St, (2 Beds, West Penthouse Units #10)
VRBO #
EMAIL ADDRESS:



## RENTAL OCCUPANCY ESTIMATE

| MONTH | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | Totals/Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROOMS | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| RATE PER ROOM PER DAY | $163 | $163 | $188 | $188 | $153 | $248 | $325 | $313 | $163 | $188 | $213 | $275 | $225 |
| DAYS BOOKED/EST | 16 | 16 | 20 | 18 | 16 | 30 | 28 | 26 | 16 | 18 | 20 | 20 | 236 |
| DAYS AVAILABLE | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| RATE PER DAY | $325 | $325 | $375 | $375 | $305 | $495 | $650 | $625 | $325 | $375 | $425 | $550 | $451 |
| WEEKLY RATE | $1,950 | $1,950 | $2,250 | $2,250 | $1,830 | $2,970 | $3,900 | $3,750 | $1,950 | $2,250 | $2,550 | $3,300 | $2,575 |
| MONTHLY/ANNUAL TOTAL | $5,200 | $5,200 | $7,500 | $6,750 | $4,880 | $10,890 | $18,200 | $16,250 | $5,200 | $6,750 | $8,500 | $11,000 | $106,320 |
| EST/ACT OCCUPANCY % | 52% | 57% | 65% | 60% | 52% | 73% | 90% | 84% | 53% | 58% | 67% | 65% | 65% |
| Est Bookings Per Mo High | 2.1 | 2.3 | 2.6 | 2.4 | 2.1 | 2.9 | 3.6 | 3.4 | 2.1 | 2.3 | 2.7 | 2.6 | 31.0 |
| COMMISSION RATE | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |
| MONTHLY/ANNUAL COMM | $1,300.00 | $1,300 | $1,875 | $1,688 | $1,220 | $2,723 | $4,550 | $4,063 | $1,300 | $1,688 | $2,125 | $2,750.00 | $26,580 |
| OWNER'S MONTHLY NET | $3,900 | $3,900 | $5,625 | $5,063 | $3,660 | $8,168 | $13,650 | $12,188 | $3,900 | $5,063 | $6,375 | $8,250 | $79,740 |



OWNER'S MONTHLY NET



Ley Rexter
caBreeze Vacation Rentals, Regional Director North County
760) 519-0377
ory@seabreezecorp.com
caBreezevacationrentals.com

### III.     Management:

Rory Revier:

I'm the Director of SeaBreeze Vacation Rentals, North County Office, and specialize in vacation rental management. Personally owning investment properties has taught me to run my vacation rental company. I possess extensive knowledge in vacation rental management from Single-Family Residences (SFR) to multi-family, acquisition, leasing, maintenance, finance, and negotiations. Born and raised in Carlsbad CA, and earned my Bachelor's Associate Degree in Business Economics from the University of California at Santa Barbara in 2002.

In 2002 I started my career in finance at Pacific Western Bank reaching Vice President and Level II Financial Analyst certifications. During that time I managed the larger metropolitan regions of the Western United States. Over my career I have managed real estate portfolios of up to $250MM, and help financed more than $400MM in real estate purchases and refinances.

SeaBreeze manages 400 vacation rental properties from San Diego to Los Angeles, and across 4 offices (La Jolla, Oceanside, Newport, & Malibu).

### IV.     SeaBreeze Services:

At SeaBreeze Vacation Rentals we maintain the highest standards of integrity and professionalism, exceeding our client's expectations, being trustworthy, honest, and connecting with our communities through charitable involvement and financial commitment.

We are a full service vacation rental company, from handling inquiries, coordinated reservations, rental agreements, inventory, revenue management, advertising, cleaning, monthly accounting, pay city taxes, etc. We earn our commission based upon 2 main elements, reservation and managing the Guest stay.

SeaBreeze will market the property to prospective vacation renters via-its website and other such online listing services for vacation rental marketing. Receive and handle all inquiries from prospective renters through our reservation team, coordinate reservations, and bookings for the property in accordance with the date(s) for which the Owner has made available to rent at a rate commensurate with current market value. Prepare all vacation rental agreements to be executed by SeaBreeze and each guest. Account for, collect and remit all rents, fees, and security deposits set forth in the rental agreement. We require that guests purchase an accidental damage waiver to cover the guest up to $2,000 of any damage during their stay.

SeaBreeze will facilitate check in/check out procedures either through the mobile concierge app/or in person depending on the booking and property. Provide a starter pack of supplies for each new guest that will include shampoo/conditioner/soap/toilet paper/paper towels/trash bags/laundry soap/dishwasher soap and a sponge. Assist with certain tenant accommodations (e.g. replacing a lost key, supplying extra towels, etc.) and make it available to handle reasonable requests of tenants. Thoroughly clean and inventory the interior of the property following the departure of each tenant. The cleaning will be the same as a hotel cleaning and will not include a deep clean of the home after each guest. SeaBreeze Inspectors come through the property after each cleaning to ensure that the property is hotel ready for the next guest arrival. Replace any damaged or stained linens during the changeover process.

## V.    Marketing:

SeaBreeze will market the property to prospective vacation renters on its direct website, Vacation Rental by Owner (VRBO), Home Away (HA), Airbnb, Flipkey, Vacation Rentals, Trip Advisor, and 30+ other affiliate sites.

In Oceanside there are approximately 900 vacation rentals, and an estimated 35% full-time vacation properties, or 315 properties.

## VI.    Owners:

Owners are responsible for the physical elements of the home; making sure at all times the property and all furnishings and appliances are in a good, habitable condition, free of defects, suitable for short term vacation rental, and free of any restrictions that would otherwise prohibit the rental of the property for vacation rental purposes. Ensuring that all utilities are current and working in the home. Maintaining current short-term rental homeowners insurance for personal injury and property damage, which sufficiently covers the property and does not contain exclusions for short-term vacation rentals and will list SeaBreeze Vacation Rentals as additional insured on their policy.

Owners are responsible for paying credit card fees, linens, towels, and bath mats for the property. There must be 2 sets, a clean set in the house and one being cleaned and prepared for the changeover. Any damaged or stained linens will be replaced and covered by the Guest Insurance. We require that each home have a professional advertising and Vacation Rental photo shoot. SeaBreeze will pay for these items and the cost will be reimbursed out of the first rents.

## VII.   Conclusion:

I recommend your 10 units building located at 314 Cleveland St. as a vacation rental, where it will earn the highest cash flow return and meet your Owner goals. Looking forward to the opportunity of serving you.

Please don't hesitate to contact me with any questions.

Warmest Regards,

Rory R. Revier

9

EXHIBIT "B"

**July 10, 2020**

**Summary of Key Terms of and Conditions for**
**DEBTOR-IN-POSSESSION TERM LOAN FACILITY**

The following summary describes certain key terms of and conditions (together with all schedules, exhibits, and other addenda hereto, the "**Term Sheet**") on which one or more funds or accounts managed or advised by Legalist, Inc. (the "**DIP Lender**") is willing to extend postpetition financing (the "**DIP Loans**") to Cleveland Street Beach Lofts, LLC (the "**Debtor**") in connection with the chapter 11 case captioned *In re Cleveland Street Beach Lofts, LLC*, No. 20-01448 (the "**Case**"), pending in the United States Bankruptcy Court for the Southern District of California (the "**Bankruptcy Court**"), in an aggregate maximum amount of $3,000,000 (the "**DIP Commitment**").[1]

This Term Sheet shall not become binding on any party until (1) the DIP Lender has completed, to its own satisfaction, a due-diligence review of the Debtor, its Case, and the DIP Collateral (defined below), (2) the Debtor has countersigned the Term Sheet and delivered the same to the DIP Lender and (3) the Bankruptcy Court has entered an Interim Order in Approved Form (defined below) (such date, the "**Effective Date**").

**Prior to the satisfaction of such conditions, this Term Sheet shall be non-binding, for discussion purposes only, and not construed as a commitment of any kind to provide the DIP Facility or any other financing. This Term Sheet shall be kept confidential until the DIP Lender consents in writing to its disclosure.**

| | |
|---|---|
| **Overview** | The DIP Loans shall be made to the Debtor from a multi-draw term loan facility in the aggregate amount of the DIP Commitment.<br><br>The Debtor shall use the proceeds of the DIP Loans solely to (the "**Permitted Uses**"):<br><br>• Pay DIP Lenders Expenses;<br>• Pay all other DIP Obligations (defined below); and<br>• Pay other amounts permitted under the Budget (defined below). |
| **Conditions Precedent to Interim Draw** | The DIP Lender will make available up to $300,000 in DIP Loans to the Debtor in a single draw (the "**Interim Draw**"), provided no Event of Default (defined below) shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom, upon occurrence of all of:<br><br>1. The DIP Lender's completion, to its own satisfaction, of any remaining due diligence;<br>2. The Debtor's delivery of a fully executed version of this Term Sheet in Approved Form;[2]<br>3. The Bankruptcy Court's entry of an interim financing order consistent in all regards with this Term Sheet, substantially in the form attached hereto as <u>Exhibit A</u>, and otherwise in Approved Form (the "**Interim DIP Order**"), which remains in full force and effect as so entered;<br>4. The Debtor's satisfaction of all applicable Milestones;[3]<br>5. The Debtor's satisfaction of all applicable Cash-Management Requirements (defined below); and<br>6. The Debtor's delivery of (x) an executed borrowing request substantially in the form attached hereto as <u>Exhibit B</u> and otherwise in Approved Form (a "**Borrowing Request**") and (y) an executed secured promissory note substantially in the form attached hereto as Exhibit C and otherwise in Approved Form (a "**DIP Note**"), in both cases in the amount of the Interim Draw. |

---

[1]    Capitalized terms used but not defined have the meanings given to them in title 11 of the United States Code (the "**Bankruptcy Code**").

[2]    "**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

[3]    "**Milestones**" refers, collectively, to events and corresponding deadlines set forth on <u>Schedule 1</u>.

| | |
|---|---|
| **Conditions Precedent to Subsequent Draw(s)** | The DIP Lender will make available up to the amount of the DIP Commitment, less any Interim Draw, in DIP Loans to the Debtor in one or more draws (each a "**Subsequent Draw**"), provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom, upon occurrence of all of:<br><br>1.  The DIP Lender's completion, to its own satisfaction, of any remaining due diligence;<br>2.  The Debtor's delivery of a fully executed credit agreement in Approved Form (the "**DIP Loan Agreement**");<br>3.  The Bankruptcy Court's entry of a final financing order consistent in all regards with this Term Sheet and the DIP Loan Agreement and otherwise in Approved Form (the "**Final DIP Order**" and, with the Interim DIP Order, the "**DIP Orders**"), which remains in full force and effect as so entered;<br>4.  The Debtor's satisfaction of all applicable Milestones;<br>5.  The Debtor's satisfaction of all applicable Cash-Management Requirements; and<br>6.  The Debtor's delivery of (x) an executed Borrowing Request and (y) an executed DIP Note, in both cases in the amount of such Subsequent Draw. |
| **Interest, Default Interest, and Undrawn Line Fee[4]** | The outstanding principal amount of the DIP Loans shall accrue interest from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 10.75% per year, payable monthly.<br><br>While an Event of Default (defined below) has occurred and is continuing, the outstanding principal amount of the DIP Loans shall accrue an additional 4.75% in interest per year, payable monthly.<br><br>Any undrawn portion of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from the Effective Date at 4.75% per year, payable monthly. |
| **Other Costs of Borrowing[5]** | The following fees shall be deemed fully and irrevocably earned upon the Effective Date:<br><br>• A onetime "**Commitment Fee**" of 2.75% of the DIP Commitment;<br>• A onetime "**Underwriting Fee**" of 1.75% of the DIP Commitment; and<br>• A "**Monitoring Fee**" of 1.75% of the DIP Commitment per year, payable monthly. |
| **Mandatory Prepayments** | The DIP Loans shall be mandatorily repaid to the extent of, and within 10 business days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral; provided that no such sale or disposition shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form; provided further that such any repayment required to be made prior to 180 days after the Effective Date shall accompanied by an additional fee of 4.75% of the amount required to be repaid (a "**Makewhole Fee**"). |
| **Voluntary Prepayments** | The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 180 days after the Effective Date, in the minimum amount of $50,000, subject to contemporaneous payment of the applicable Makewhole Fee. |
| **Maturity Date** | The DIP Loans shall mature, and all unpaid DIP Obligations shall be due and payable, upon the earliest of (the "**Maturity Date**"):<br><br>• 360 days after the Effective Date; and<br>• The acceleration of the DIP Loans following an Event of Default. |

---

[4]   Interest (including any applicable default interest) and any applicable Undrawn Line Fee shall be due and payable in cash in arrears on the first business day of each month.

[5]   The Commitment Fee and Underwriting Fee shall be due and payable in cash upon the Maturity Date (defined below). The Monitoring Fee shall be due and payable in cash in arrears on the first business day of each month.

| | |
|---|---|
| **Superpriority Claims and DIP Liens** | All DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims,[6] payable from and having recourse to all DIP Collateral, including (upon entry of the Final DIP Order) all Avoidance Actions.[7] |
| | The Debtor shall pledge, and grant the DIP Lender Liens on and Security Interests in, all DIP Collateral with the following priorities (collectively, the "**DIP Liens**"), effective upon entry of, and as provided in, the Interim DIP Order (or, in the case of Avoidance Actions, upon entry of the Final DIP Order), and all DIP Obligations shall: |
| | • Pursuant to Bankruptcy Code section 364(c)(2), be secured by an automatically perfected, senior DIP Lien on all DIP Collateral not subject to Existing Liens; |
| | • Pursuant to Bankruptcy Code section 364(c)(3), be secured by automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens;[8] |
| | • Pursuant to Bankruptcy Code section 364(d)(1), be secured by automatically perfected, equal DIP Liens on all DIP Collateral and all proceeds thereof subject to Existing Liens, other than Permitted Senior Liens;[9] and |
| | • Pursuant to Bankruptcy Code section 364(d)(1), be secured by automatically perfected, senior DIP Liens on all DIP Collateral and proceeds thereof subject to Existing Liens, other than Permitted Senior Liens. |
| **DIP Collateral** | The DIP Loans shall be secured by DIP Liens on all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), together with (in each case) all proceeds thereof (collectively, the "**DIP Collateral**"), expressly including (upon entry of the Final DIP Order) all Avoidance Actions; provided that the DIP Collateral shall not include Excluded Collateral.[10] |
| **Carveout** | In consideration of the full and unconditional waiver of the right of any party to surcharge any DIP Collateral, whether under Bankruptcy Section 506(c) or otherwise, as shall be provided in the DIP Orders, the DIP Lender shall grant a customary carveout to permit the Debtor to pay administrative expenses to the extent permitted by the Budget (the "**Carveout**"); provided that, upon delivery of a Carveout Trigger Notice, the Carveout shall be limited solely to the Triggered Carveout Cap (as each shall be defined in the DIP Orders) of 2.5% of the then-outstanding DIP Loans. |
| | In no event shall any part of the Carveout be used to fund fees, costs, or expenses incurred in (i) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person (as defined below) or (ii) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender. |

---

[6]  "**DIP Claims**" means "superpriority" administrative-expense claims with priority over (i) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (defined below)) and (ii) all other unsecured claims against the Debtor.

[7]  "**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

[8]  "**Existing Liens**" means the Liens set forth on Schedule 2.

[9]  "**Permitted Senior Liens**" means the Liens set forth on Schedule 3.

[10]  "**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

| | |
|---|---|
| **Budget and Required Budget Reporting; Permitted Variances** | Prior to the Effective Date, the Debtor shall deliver a budget encompassing, on a weekly basis, the period from the Effective Date through the satisfaction of the final Milestone and containing detailed line items of the Debtor's projected receipts and disbursements, in Approved Form (such budget, or as the same may be revised by the Debtor from time to time in Approved Form, the "**Budget**"). The initial Budget is attached hereto as <u>Exhibit D</u>.[11]<br><br>No later than the Tuesday of each week following the Effective Date, the Debtor shall provide the DIP Lender (each in Approved Form):<br><br>• A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding week and cumulatively from the Effective Date, together with detailed explanations of all variances (if any); and<br>• A rolling 13-week cashflow forecast for the Debtor.<br><br>In no event shall actual cash receipts vary upward, or cash disbursements vary downward, from the Budget (on a line-item, weekly, or cumulative basis) by more than 7.5% (the "**Permitted Variances**"). |
| **Cash-Management Requirements** | The Debtor shall establish and maintain a cash-management system in Approved Form, which system shall (at a minimum) (i) provide for real-time reporting to the DIP Lender of all receipts and disbursements in all deposit accounts of the Debtor, (ii) include, for each such account (other than payroll accounts, a "**DIP Blocked Account**"), a deposit account control agreement in favor of the DIP Lender sufficient to grant the DIP Lender "control" thereof under the Uniform Commercial Code and otherwise in Approved Form, and (iii) prohibit the Debtor's use of any deposit account (other than with respect to near-term payroll obligations) that is not a DIP Blocked Account (collectively, the "**Cash-Management Requirements**"). |
| **Debtor's Representations and Warranties** | Customary for postpetition financing of this kind and as otherwise reasonably required by the DIP Lender, to be made by the Debtor as of the Effective Date and the date of each Interim and Final Draw. |
| **Debtor's Affirmative Covenants** | Customary for postpetition financing of this kind and as otherwise reasonably required by the DIP Lender, including (without limitation), so long as any DIP Obligation remains unpaid, the Debtor shall:<br><br>• Take all steps necessary or desirable to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral;<br>• Comply with the Budget (subject to Permitted Variances), including all related reporting;<br>• Promptly provide the DIP Lender with all information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, as may be requested by the DIP Lender;<br>• Commence all actions, file all motions, applications, and proposed orders with, and make all other submissions to the Bankruptcy Court only in Approved Form;<br>• Satisfy all Cash-Management Requirements at all times;<br>• Satisfy all Milestones; and<br>• Timely pay all DIP Lender Expenses and other DIP Obligations. |

---

[11]  In no event shall the Budget provide for payment of fund fees, costs, or expenses incurred by any party in (i) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (ii) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

| | |
|---|---|
| **Debtor's Negative Covenants** | Customary for postpetition financing of this kind and as otherwise reasonably required by the DIP Lender, including (without limitation), so long as any DIP Obligation remains unpaid, the Debtor shall not:<br><br>• Grant or permit to exist any Lien on or Security Interest in any DIP Collateral, or otherwise pledge or encumber the same, other than the DIP Liens and Permitted Liens;<br>• Make any payment not contemplated by the Budget (subject to Permitted Variances); or<br>• Commence any action, file any motion, application or proposed order, or make any other submission in the Bankruptcy Court other than in Approved Form; or<br>• Use the proceeds of the DIP Loan for any purpose other than the Permitted Uses. |
| **Events of Default** | Customary for postpetition financing of this kind and as otherwise reasonably required by the DIP Lender, including (without limitation), so long as any DIP Obligation remains unpaid (each an "**Event of Default**"):<br><br>1. The Debtor shall:<br><br>   a. Fail to timely pay any DIP Obligation;<br>   b. Grant or permit to exist any Lien on or Security Interest in, or otherwise pledge or encumber, any DIP Collateral, other than the DIP Liens and Permitted Liens;<br>   c. Fail to satisfy any Milestone, within 2 business days of its stated deadline;<br>   d. Make any payment not contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances); or<br>   e. Fail at any time to satisfy any Cash-Management Requirement.<br><br>2. Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document,[12] by the Debtor shall be false in any material respect as of the date so made, deemed made, or delivered;<br><br>3. The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender, as described on <u>Schedule 5</u>;<br><br>4. The Debtor, or an Affiliate thereof, shall commence any action, file any motion or application, or make any other submission in the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same):<br><br>   a. Seeking entry of any order described in the foregoing Item 3; or<br>   b. Questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender thereunder or otherwise available;<br><br>5. Any party (other than the Debtor or an Affiliate thereof) shall commence any action, file any motion or application, or make any other submission in the Bankruptcy Court or another court of competent jurisdiction:<br><br>   a. Seeking entry of any order described in the foregoing Item 3; or<br>   b. Questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the validity, perfection, or priority thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender thereunder or otherwise available; |

---

[12] The "**DIP Loan Documents**" means this Term Sheet, all Borrowing Requests, all DIP Notes, the DIP Credit Agreement, the DIP Orders, the Budget and related reporting, all documents relating to the Cash Management System Requirements, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

|  |  |
|---|---|
|  | <u>provided</u> that the Debtor has not timely filed a reasonable objection or opposition to such action, motion, or other submission |
|  | 6.   The Debtor shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Items 1-5; <u>provided</u> such failure has not been remedied within 21 days of the earlier of (x) the Debtor's becoming aware of such failure or (ii) the Debtor's receipt of written notice from the DIP Lender of such failure. |
| **Rights and Remedies of DIP Lender** | Subject only to the DIP Orders, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:<br><br>1.   Declare the DIP Commitment terminated;<br>2.   Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor;<br>3.   Terminate the Debtor's access to any DIP Blocked Account; and<br>4.   Setoff against any outstanding DIP Obligation all amounts held in the DIP Blocked Accounts (less, cumulatively across such accounts, the Triggered Carveout Cap amount).<br><br>While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:<br><br>1.   Terminating the automatic stay with respect to any DIP Collateral;<br>2.   Terminating the Debtor's exclusivity to propose a plan;<br>3.   Appointing an examiner or chapter 11 trustee; and<br>4.   Converting the Debtor's Case to chapter 7.<br><br>If the DIP Lenders so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtor expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.<br><br>In addition to the rights and remedies enumerated above, the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to all pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code. |
| **Indemnity** | The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc.), together with their respective partners, directors, officers, managers, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in connection with, arising from, or relating to the Debtor or its Case, any DIP Loan Document, any transaction contemplated thereby, or any action taken or not taken pursuant thereto (including any exercise of rights or remedies (and expressly including all collection efforts)) (collectively, the "**Indemnified Losses**"); <u>provided</u> that such indemnity shall not be available to an Indemnified Person in the event that any Indemnified Loss has been determined by a court of competent jurisdiction, in a final and non-appealable order, to have resulted from the gross negligence or willful misconduct of such Indemnified Person. |

| | |
|---|---|
| **DIP Lender Expenses; Other DIP Obligations** | The Debtor shall pay promptly, without notice to or approval of any third party (including the Bankruptcy Court) all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtor or its Case, the DIP Loan Documents and the transactions contemplated thereby, and any exercise of rights or remedies (expressly including all collection efforts), whether incurred before or after the Effective Date, including (without limitation) all fees, expenses, and disbursement of outside counsel or other advisor retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"). |
| | The DIP Lender Expenses, together with all principal of, and interest and fees on, the DIP Loans, together with any amount owed to any Indemnified Person, and any other amount owed by the Debtor under any DIP Loan Document shall constitute "**DIP Obligations**." |
| **Miscellaneous Provisions** | <u>Stay Waiver</u>: The DIP Orders shall become immediately effective upon entry, notwithstanding any otherwise applicable stay (including under Bankruptcy Rule 6004). |
| | <u>Section 364(e)</u>: The DIP Orders shall contain customary "good faith" findings in favor of the DIP Lender. |
| | <u>Governing Law</u>: The Bankruptcy Code and, to the extent not superseded thereby, New York. |
| | <u>Other Terms and Conditions</u>: Customary for postpetition financing of this kind and as otherwise reasonably required by the DIP Lender. |

Accepted and agreed to, as of the first date written above:

DEBTOR:                                     CLEVELAND STREET BEACH LOFTS, LLC

                                            By: _____
                                            Name:
                                            Title:

DIP LENDER:                                 LEGALIST, INC., on behalf of those funds and/or
                                            accounts managed and/or advised by it

                                            By: _____
                                            Name:   Eva Shang
                                            Title:   President

**Schedule 1**

**(Milestones)**

**[To Be Completed by Debtor]**

| Event | Deadline |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**<u>Schedule 2</u>**

**(Existing Liens)**

**[To Be Completed by Debtor]**

**<u>Schedule 3</u>**

**(Permitted Senior Liens)**

**[To Be Completed by Debtor]**

## Schedule 4

**(Excluded Collateral)**

**[To Be Completed by Debtor]**

**Schedule 5**

**(Events of Default, Item 3)**

i.   Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget;

ii.  Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to the DIP Collateral;

iii. Surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

iv.  Approving credit or debt (other than the DIP Loans) secured by a Lien, Security Interest, pledge, or other encumbrance, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral;

v.   Approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

vi.  Modifying, staying, vacating, or rescinding any part of any DIP Order;

vii. Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender thereunder or otherwise available to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

viii. Enjoining, restraining, or in any other way preventing a Debtor from conducting any material part its business affairs;

ix.  Appointing an examiner or trustee in the Debtor's case;

x.   Confirming any plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations;

xi.  Converting the Debtor's Case to a case under Bankruptcy Code chapter 7; or

xii. Dismissing the Debtor's Case.

**<u>Exhibit A</u>**

**(Form of Interim DIP Order)**

**[To Be Provided by DIP Lender]**

**Exhibit B**

**(Form of Borrowing Request)**

**[To Be Provided by DIP Lender]**

**Exhibit C**

**(Form of DIP Note)**

**[To Be Provided by DIP Lender]**

**<u>Exhibit D</u>**

**(Budget)**

**[To Be Provided by Debtor]**